IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-00348-MEH

FREDERIC CHARLES DENEFFE,

      Plaintiff,

v.

SKYWEST, INC.,

      Defendant.

---

## ORDER ON MOTION TO DISMISS

---

**Michael E. Hegarty, United States Magistrate Judge**.

    Before the Court is the Defendant's Motion to Dismiss for Failure to State a Claim for Relief Pursuant to Fed. R. Civ. P. 12(b)(6) [filed March 3, 2015; docket #52].  This matter is fully briefed, and the Court finds that oral argument (not requested by the parties) would not materially assist the Court in adjudicating the motion.  For the following reasons, the motion is **denied**.

## BACKGROUND

    Plaintiff Frederic Charles Deneffe ("Deneffe") initiated this employment discrimination action against SkyWest, Inc. ("SkyWest") on February 7, 2014.

### I.    Procedural History

    Following this Court's January 16, 2015 order granting in part and denying in part SkyWest's Motion for Judgment on the Pleadings and Deneffe's Motion for Leave to File a Second Amended Complaint, Deneffe filed the operative Second Amended Complaint on January 20, 2015 alleging essentially that SkyWest violated Title VII of the Civil Rights Act of 1964, as amended ("Title VII") and the Age Discrimination in Employment Act ("ADEA") by "submitting false and derogatory information to potential employers describing the reasons that SkyWest terminated

Deneffe's employment" based upon Deneffe's sex, sexual orientation and age. *See* Second Amended Complaint, ¶¶ 1, 158, 159, 169, and 170, docket #48.

SkyWest filed the present motion to dismiss in response to the operative pleading on March 3, 2015, arguing that Deneffe's facts do not support his "discrimination" claims and, while the facts may support "retaliation" claims, Deneffe did not allege retaliation by SkyWest and cannot now allege retaliation under Title VII or the ADEA, because he has failed to exhaust administrative remedies.

Deneffe counters that SkyWest "premises its argument on a misinterpretation" of a Supreme Court opinion, and the argument is "inconsistent with that of the EEOC" and with "Congressional intent that the statute offer broad remedial measures for actions that limit employment opportunities." Deneffe asserts that SkyWest's provision of the termination form to potential employers is a term, condition, or privilege of employment for which Title VII and ADEA offer protections against discrimination.

SkyWest replies arguing primarily that Deneffe's allegations are conclusory and insufficient to state plausible claims for relief under Title VII or the ADEA. Specifically, SkyWest asserts Deneffe fails to allege how he did not conform to male stereotypes for his Title VII claim, and that decision makers actually considered his protected status when they terminated his employment.

Because SkyWest raised issues in its reply that were not fully addressed in the briefing, the Court directed Deneffe to file a supplemental brief. Deneffe timely filed a "surreply" contending that SkyWest asks the Court to impose an improper (more stringent) pleading standard and mischaracterizes his allegations, which are sufficient to state plausible claims under both Title VII and ADEA.

## II.    Facts

2

The following are factual allegations (as opposed to legal conclusions, bare assertions, or merely conclusory allegations) made by Deneffe in the operative Second Amended Complaint and pertinent to the present motion, which are taken as true for analysis under Fed. R. Civ. P. 12(b)(6) pursuant to *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009):

Deneffe is a 51-year-old gay male and has been with his partner, Mr. Riku Doi, for 12 years. He was 49 years old at the time he was terminated from employment with SkyWest.

Deneffe is a certified passenger airline pilot, cargo airline pilot, and pilot instructor. Prior to Deneffe's employment with SkyWest, he had logged over 2300 hours of flight time. Throughout his career as a pilot, Deneffe was never involved in an accident, nor was he cited for any violation of Federal Aviation Administration (FAA) rules.

SkyWest hired Deneffe as a first officer on July 25, 2011 and assigned him to fly Bombardier CRJ 200 and CRJ 700 aircraft. Deneffe was based out of Denver International Airport (DIA) in Colorado. In July and August 2011, Deneffe attended ground training school in Salt Lake City, Utah, at SkyWest headquarters and passed all written and flight exams given during that time. Between September 1 and October 2, 2011, Deneffe passed all training required to fly CRJ 200 and CRJ 700 aircraft. On September 26, 2011, the FAA issued Deneffe a New Airline Pilot License for CRJ 200, 700, and 900 aircraft.

From October 5-28, 2011, Deneffe began his Initial Operating Experience (IOE), additional training flights with experienced SkyWest captains serving as "check airmen" who assess newly-qualified pilots' proficiency in a number of areas. On October 28, 2011, Deneffe completed his IOE training.

During many flights Deneffe piloted, other pilots jokingly insinuated that male flight attendants were homosexual, referring to them by the nickname of "Susie." Deneffe once heard

another pilot refer to male flight attendants as "the little faggots who bring us our coffee." Other male pilots also commented, "I am not getting laid this trip," and "I will make sure I double lock my room," when only male attendants were on a flight. Male pilots frequently made disparaging remarks about openly gay men in general, with comments such as "Freddie Mercury was so talented, it's such a shame he's gay."

During flights, male pilots also regularly engaged in banter about their heterosexual exploits. At least one pilot sent Deneffe text messages detailing his sexual exploits with a woman. Deneffe was conspicuously silent when his co-workers discussed their sexual activities with women, made homosexual jokes, or talked about their wives and children.

At the time Deneffe was hired, he listed the name of his male partner, Riku Doi, as the only beneficiary for his flight privileges on the airline, which are available only for family members, spouses, or gay partners. Deneffe took one or two trips each month with Doi, including a long trip to Hawaii. Many other pilots within the SkyWest community saw Deneffe and Doi at the airport and on flights together. At one point, Deneffe talked about his sexual orientation with a female pilot, Captain Gina Martyn, who is openly lesbian.

During his tenure, Deneffe was considerably older than most first officers employed by SkyWest. Deneffe began working for SkyWest as a novice passenger airline pilot at the age of 48. The typical age for pilots who begin their commercial airline careers at SkyWest is about 25, and most pilots are around 30 years old. Most other pilots of Deneffe's age were captains.

After Deneffe completed his IOE and Line Check, SkyWest assigned him the role of First Officer "in reserve," meaning that the airline did not assign him a specific schedule or routes but, rather, called upon Deneffe to fly as needed. Deneffe piloted flights for SkyWest under the airlines Delta Connection, United Express, and Alaska Airlines. Deneffe successfully completed 231 flights

in CRJ 200 and 700 aircraft without a single violation, warning, or accident.

Throughout his tenure with SkyWest, captains and crew members with whom Deneffe flew frequently praised Deneffe's performance and attitude. Deneffe was praised on two occasions for exemplary work that he performed above and beyond his assigned duties.

On January 31, 2012, Deneffe met with Chief Pilot Rob Graser for a six-month performance review. This performance review was the first and only formal review SkyWest gave to Deneffe during his employment as a pilot. Deneffe's six-month review lasted, at most, 20 minutes, during which time Graser joked around with Deneffe and indicated that he had no concerns about Deneffe's performance. Graser showed Deneffe an evaluation form that Captain Gina Martyn had completed, and he told Deneffe not to take any of Martyn's criticism too seriously.

After Deneffe's six-month review, Graser began soliciting comments from captains who had flown with Deneffe. A number of the captains who flew with Deneffe noted that because SkyWest called him infrequently while he was on reserve, Deneffe had lost proficiency on some skills but regained it after logging more flight hours. Having been placed "on reserve" from October 2011 through June 2012, Deneffe logged only about 400 hours of flight time. None of the pilots who provided information to Graser recommended terminating Deneffe, nor did they recommend sending him for any training.

After reviewing feedback from pilots who had flown with Deneffe between January and May 2012, Graser did not notify Deneffe of any concerns about his performance, nor did he recommend that Deneffe undergo additional training.

On or around May 21, 2012, SkyWest designated Deneffe's actions a Scheduled Assignment Deviation ("SAD") when SkyWest schedulers called him to report for a flight. Deneffe remained in the flight crew lounge area for the required period of time, but his cell phone did not ring and he

did not receive notification of the call until he exited the airport building, 35 minutes after SkyWest schedulers had left a message for him.   Deneffe called SkyWest scheduling representatives immediately after he received the message and explained what had happened but was told that the incident had to be reported in Deneffe's personnel records.   Deneffe planned to appeal the notation of the SAD in his personnel records to Chief Pilot Graser.

On or around May 29, 2012, Horizon Air, a regional partner airline with SkyWest, notified SkyWest that in early May it had removed Deneffe, an off-duty passenger, from one of its flights because he had commented loudly to flight crew on the safety and condition of the aircraft, a turbo prop plane.

On June 1, 2012, SkyWest moved Deneffe out of reserve status and placed him on "the line" as a regular pilot.   SkyWest scheduled Deneffe for flights totaling 80 hours in June.

On June 7, 2012, Chief Pilot Graser called Deneffe into his office.   Graser said that he had bad news for Deneffe and explained that SkyWest was terminating Deneffe's employment.   Deneffe was shocked and asked Graser to explain the grounds for SkyWest's decision.   Graser said that SkyWest was "not happy with Deneffe's work."   Graser said that neither Deneffe's removal from the Horizon Air flight nor his being cited with a SAD were the reasons for SkyWest's decision.

When Deneffe asked Graser to describe specific incidents or examples of performance with which SkyWest was unsatisfied, Graser briefly mentioned criticism of Deneffe's performance dating back to November 2011, before his performance review.   Deneffe told Graser that SkyWest's decision made no sense, because no one had notified Deneffe of any concerns about his performance since the date of his performance review.   Graser coldly replied, "It was our decision," but did not elaborate further.   Graser did not give Deneffe a letter of termination or any other documentation stating the reasons for termination.

6

On or around June 21, 2012, Deneffe emailed Sheryl Sachse, SkyWest Employee Relations Manager, to inquire about the reasons that SkyWest had terminated his employment.  On or around August 1, 2012, Todd Emerson, SkyWest's General Counsel, replied to Deneffe's email, stating that SkyWest had terminated Deneffe during his "probationary period" because he "did not meet all of the probationary conditions" required of SkyWest pilots.  According to Emerson, "[E]ven if [the probationary] conditions had been met, SkyWest could still have ended its employment relationship with [Deneffe] without cause or advance notice."  Emerson did not elaborate on what "probationary conditions" SkyWest believed Deneffe had not met.

Following his termination from SkyWest, Deneffe began applying for positions with other airlines.  Under the Pilot Records Improvement Act ("PRIA"), prior employers are required to maintain copies of a pilot's flight and training records, and to provide such documents to potential employers.  The prior employer must obtain consent to disclose records pertaining to the pilot whose records are sought by a potential employer.

In or around March 2013, another airline was considering hiring Deneffe and sought to obtain a copy of his flight records from SkyWest.  On March 5, 2013, Deneffe signed a release allowing SkyWest to provide a potential employer the records it had maintained relating to Deneffe's employment.  On or around April 26, 2013, Deneffe received a copy of the documents SkyWest disclosed in response to the March 2012 PRIA request.  The file included a SkyWest form titled "Termination Information," which stated the reason for terminating Deneffe as "Performance/ Inability."  SkyWest indicated on the same form that Deneffe was "Ineligible for Rehire."

Since SkyWest terminated Deneffe's employment, he applied for numerous pilot positions and attended several aviation job fairs.  SkyWest's stated reason for terminating Deneffe has all but made him unemployable as a pilot.  One airline recruiter told Deneffe, "With a termination like that,

we're not going to take you," or similar words.

## LEGAL STANDARDS

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility, in the context of a motion to dismiss, means that the plaintiff pled facts which allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id. Twombly* requires a two-prong analysis. First, a court must identify "the allegations in the complaint that are not entitled to the assumption of truth," that is, those allegations which are legal conclusions, bare assertions, or merely conclusory. *Id.* at 678-80. Second, the Court must consider the factual allegations "to determine if they plausibly suggest an entitlement to relief." *Id.* at 681. If the allegations state a plausible claim for relief, such claim survives the motion to dismiss. *Id.* at 680.

Plausibility refers "to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012) (quoting *Robbins v. Okla.*, 519 F.3d 1242, 1247 (10th Cir. 2008)). "The nature and specificity of the allegations required to state a plausible claim will vary based on context." *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011). Thus, while the Rule 12(b)(6) standard does not require that a plaintiff establish a prima facie case in a complaint, the elements of each alleged cause of action may help to determine whether the plaintiff has set forth a plausible claim. *Khalik*, 671 F.3d at 1191.

However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. The complaint must provide "more

8

than labels and conclusions" or merely "a formulaic recitation of the elements of a cause of action," so that "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint has made an allegation, "but it has not shown that the pleader is entitled to relief." *Id.* (quotation marks and citation omitted).

## ANALYSIS

"A plaintiff proves a violation of Title VII either by direct evidence of discrimination or by following the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed.2d 668 (1973)." *Khalik*, 671 F.3d at 1192. The same analysis is used in the adjudication of claims under the ADEA. *Jones v. Okla. City Public Schs.*, 617 F.3d 1273, 1279 (10th Cir. 2010).

"[The] *McDonnell Douglas* ... three-step analysis requires the plaintiff first prove a *prima facie* case of discrimination." *Id.* To establish a *prima facie* case, "a plaintiff must establish that (1) [he] is a member of a protected class, (2) [he] suffered an adverse employment action, (3) [he] was qualified for the position at issue, and (4) [he] was treated less favorably than others not in the protected class." *Id.* If Deneffe makes out a *prima facie* case, "[t]he burden then shifts to the defendant to produce a legitimate, non-discriminatory reason for the adverse employment action." *Id.* If SkyWest meets that burden, "the burden then shifts back to the plaintiff to show that [his] protected status was a determinative factor in the employment decision or that the employer's explanation is pretext." *Id.*

In this case, SkyWest argues Deneffe cannot establish a *prima facie* case in that his allegations fail to state a protected status under Title VII, an adverse employment action, and that he was treated less favorably than heterosexual males.

## I.      Protected Status

Both parties acknowledge that the Tenth Circuit has not recognized a Title VII claim for discrimination based on sexual orientation, and that Deneffe's Title VII claim is premised on Deneffe's failure to conform to gender stereotypes. While the Tenth Circuit has not decided whether discrimination based on an employee's failure to conform to sex stereotypes always constitutes discrimination "based on sex," the court has assumed that a transsexual who alleged, as a biological male, she did not act or appear as a male is expected to act or appear established a *prima facie* case of gender stereotyping under a Rule 56 analysis. *Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1224 (10th Cir. 2007).

SkyWest argues that Deneffe's complaint fails to state *how* he did not conform to male stereotypes. Deneffe counters that the following allegations support his claim: (1) he did not take part in male braggodicio about sexual exploits with women as the other male pilots did; (2) he did not joke about gays as other male pilots did, (3) he submitted paperwork to SkyWest designating his male domestic partner for flight privileges, a benefit offered only for family members and domestic partners; and (4) he traveled on SkyWest flights with his domestic partner. Surreply, docket #64 at 5.

The Court finds that these alleged facts, together with Deneffe's allegation that the conduct by other male pilots was "regular," "frequent," and occurred during "many" flights, suffice to state a plausible claim that the chief pilot submitted a negative PRIA employment reference based on Deneffe's failure to conform to male stereotypes. *See id.*; *see also E.E.O.C. v. Boh Bros. Constr.*

*Co., L.L.C.*, 731 F.3d 444, 456 (5th Cir. 2013) (permitting the plaintiff to rely on evidence that a supervisor viewed the claimant as "insufficiently masculine" to prove its Title VII claim).

## II.     Adverse Employment Action

Relying primarily on the Supreme Court's opinion in *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53 (2006), SkyWest argues that Title VII's discrimination provision does not protect against post-termination conduct by the employer.  Specifically, SkyWest contends that the *Burlington* Court distinguished between the discrimination and retaliation provisions of Title VII in determining that a retaliation claim may be based on any action that would dissuade a reasonable employee from making or supporting a charge of discrimination, including post-termination actions. *See id.* at 68.  SkyWest argues that, in light of *Burlington*, only the retaliation provision of Title VII, as opposed to its substantive discrimination provision, permits claims based on post-termination conduct.  The Court disagrees.

The Tenth Circuit has "liberally define[d] the phrase 'adverse employment action,'" and takes "a case-by-case approach, examining the unique factors relevant to the situation at hand." *E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1040 (10th Cir. 2011) (quoting *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 532 (10th Cir. 1998) and *Hillig v. Rumsfeld*, 381 F.3d 1028, 1031 (10th Cir. 2004)); *see also Jones*, 617 F.3d at 1279.  The Tenth Circuit determined that this standard did not change following the Supreme Court's opinion in *Burlington Northern*:

> The Supreme Court most recently addressed the contours of adverse employment actions in *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 126 S. Ct. 2405, 165 L. Ed.2d 345 (2006). The Court made clear the substantive discrimination provisions of Title VII are limited "to [adverse] actions that affect employment or alter the conditions of the workplace." 126 S.Ct. at 2412. ***Thus, while* Burlington Northern *modified our retaliation standards for adverse actions, it had no similar effect on our discrimination jurisprudence.*** Accordingly, we continue to examine claims of adverse action on the basis of race or sex discrimination on a case-by-case basis, "examining the unique factors relevant to the situation at hand." *Sanchez*, 164 F.3d at 532.

*Piercy v. Maketa*, 480 F.3d 1192, 1203 (10th Cir. 2007) (emphasis added).

Thus, generally, "[o]nly 'acts that constitute a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits will rise to the level of an adverse employment action." *C.R. England, Inc.*, 644 F.3d at 1040 (citation omitted); *see also Piercy*, 480 F.3d at 1203. "However, the term 'adverse employment action' is not necessarily 'limited to such acts.'" *C.R. England, Inc.*, 644 F.3d at 1040 (quoting *Hillig*, 381 F.3d at 1032-33). In *Hillig*, the Tenth Circuit held "an act by an employer that does more than *de minimis* harm to a plaintiff's future employment prospects can, when fully considering the unique factors relevant to the situation at hand, be regarded as an adverse employment action, even where plaintiff does not show the act precluded a particular employment prospect." *Hillig*, 381 F.3d at 1033 (internal quotations and citations omitted).

Although *Hillig* involved the appeal of a trial court's judgment as a matter of law dismissing a plaintiff's Title VII retaliation claim, *Hillig* was cited with approval in the Tenth Circuit's post-*Burlington Northern* opinions in *Piercy*, 480 F.3d at 1203 (sex discrimination claim), *Jones*, 617 F.3d at 1279 (age discrimination claim) and *C.R. England*, 644 F.3d at 1040 (disability discrimination claim). Moreover, determining a harmful, negative employment reference to be an adverse employment action is consistent with the substantive provisions of Title VII, which provide:

It shall be an unlawful employment practice for an employer –

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of

12

such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a).  In fact, in a post-*Burlington Northern* case, the Supreme Court affirmed that "Title VII prohibits discrimination on the basis of race, color, religion, sex, and national origin with respect to ... compensation, terms conditions, or privileges of employment, and discriminatory practices that would deprive any individual of employment opportunities or otherwise adversely affect his status as an employee."  *Thompson v. North Am. Stainless, L.P.*, 562 U.S. 170, 173-74 (2011) (emphasis added) (citing *Burlington Northern*, 548 U.S. at 62) (internal quotation marks omitted).  Certainly, a negative employment reference could adversely affect an individual's conditions or privileges of employment and/or deprive an individual of employment opportunities.

Furthermore, such determination is consistent with *Burlington Northern*; there is nothing in the Supreme Court's opinion limiting the reach of § 2000e-2(a) to conduct that occurred *during* the individual's employment.  In holding that the anti-retaliation provision of Title VII (42 U.S.C. § 2000e-3) "extends beyond workplace-related or employment-related retaliatory acts and harm," the Supreme Court differentiated between the language of the anti-retaliation provision and that of the anti-discrimination provision, characterizing the latter as "limit[ing] the scope ... to actions that affect employment or alter the conditions of the workplace."  *Burlington Northern*, 548 U.S. at 62. However, even considering such limitation, a harmful, negative employment reference is an action that could adversely "affect employment."

Moreover, this Court notes that the discrimination provision, unlike the retaliation provision, protects "any individual" from discrimination with respect to the terms, conditions or privileges of employment and which would deprive "any individual" of employment opportunities or otherwise adversely affect his status as an employee.  42 U.S.C. § 2000e-2(a).  The Second and Fourth Circuits have found, post-*Burlington*, that "[a] natural reading of 42 U.S.C. § 2000e-2(a)(1) suggests that the

'individual' it references is a potential, current, or past employee of the employer." *Gerner v. Cnty. of Chesterfield*, 674 F.3d 264, 268 (4th Cir. 2012) (quoting *Gulino v. N.Y. State Educ. Dep't*, 460 F.3d 361, 374 (2d Cir. 2006) (internal quotation marks and brackets omitted)).  This conclusion is consistent with *Burlington Northern* and its progeny that emphasize Title VII's discrimination provision to be limited to actions that affect employment or alter the conditions of the workplace.

Accordingly, the Court finds Deneffe has properly stated under Title VII and the ADEA the alleged adverse action by SkyWest of submitting PRIA forms (after Deneffe's termination of employment) containing negative employment information that is distributed to potential employers.

## III.    Treated Less Favorably

Concerning this element, SkyWest argues:

> Here, Plaintiff's allegations are conclusory. He has failed to plead any facts tying his protected age status and gender status to the termination of his employment. ... In addition, he does not allege that SkyWest's decision makers actually considered his protected status when it made the decision to terminate his employment. Plaintiff merely concludes (or refuses to accept the fact that he was terminated due to performance deficiencies) that the real reason for his termination must have been because he was gay and over the age of 40. However, Plaintiff has failed to plead sufficient facts showing that there is a link between his protected statuses and the termination of his employment.

Reply, docket #61 at 5-6.[1]  While this may be true, Deneffe's termination claims were dismissed on January 16, 2015; the only claims remaining allege that SkyWest discriminated against Deneffe based on age and sex when it submitted a negative and, allegedly, untrue employment reference/report pursuant to the PRIA.  Consequently, SkyWest's arguments do not persuade the Court that Plaintiff has failed to plausibly state the causation element of his *prima facie* case under Title VII and the ADEA.

---

[1]SkyWest also comments in the introduction section of its Reply: "Importantly, Plaintiff does not allege that Chief Pilot Graser or any other SkyWest decision maker provided any indication to Plaintiff that his termination was based upon either sex or age."  *Id.* at 1-2.

## **CONCLUSION**

Accordingly, Defendant's Motion to Dismiss for Failure to State a Claim for Relief Pursuant to Fed. R. Civ. P. 12(b)(6) [filed March 3, 2015; docket #52] is **denied**.

The Court will hold a Status Conference in this case on **Tuesday, May 26, 2015 at 3:00 p.m.** in Courtroom A-501, on the fifth floor of the Alfred A. Arraj United States Courthouse located at 901 19th Street, Denver, Colorado.  If this date is not convenient, counsel should confer with opposing counsel and contact my Chambers to obtain an alternate date.  Counsel for the parties shall be prepared to discuss the status and posture of this case.

Dated at Denver, Colorado, this 11th day of May, 2015.

BY THE COURT:

Michael E. Hegarty
United States Magistrate Judge