IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-00348-MEH

FREDERIC CHARLES DENEFFE,

       Plaintiff,

v.

SKYWEST, INC.,

       Defendant.

---

## ORDER ON MOTION FOR SUMMARY JUDGMENT

---

**Michael E. Hegarty, United States Magistrate Judge**.

       Before the Court is the Defendant's Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56 and D.C. Colo. LCivR 56.1 [filed February 4, 2016; docket #92]. This matter is fully briefed; the parties have not requested oral argument, and the Court finds it would not materially assist the Court in adjudicating the motion. For the following reasons, the motion is granted in part and denied in part.[1]

## BACKGROUND

       Plaintiff Frederic Charles Deneffe ("Deneffe") initiated this employment discrimination action against SkyWest, Inc. ("SkyWest") on February 7, 2014.

### I.    Procedural History

       Following this Court's January 16, 2015 order granting in part and denying in part SkyWest's Motion for Judgment on the Pleadings and Deneffe's Motion for Leave to File a Second Amended Complaint, Deneffe filed the operative Second Amended Complaint on January 20, 2015

---

[1]The parties consented to this Court's jurisdiction pursuant to 28 U.S.C. § 636(c) and D.C. Colo. LCivR 40.1(c) on July 7, 2014. Docket #19.

alleging essentially that SkyWest violated Title VII of the Civil Rights Act of 1964, as amended ("Title VII") and the Age Discrimination in Employment Act ("ADEA") by "submitting false and derogatory information to potential employers describing the reasons that SkyWest terminated Deneffe's employment" based upon Deneffe's gender and age. *See* Second Amended Complaint, ¶¶ 1, 158, 159, 169, and 170, docket #48.

SkyWest filed a motion to dismiss in response to the operative pleading on March 3, 2015, and briefing was concluded on April 20, 2015. The Court denied the motion on May 11, 2015 finding that Deneffe stated plausible Title VII and ADEA claims alleging SkyWest discriminated against him based on age and sex when it submitted a negative and, allegedly, untrue employment reference/report pursuant to the Pilot Records Improvement Act. Order, docket #65. SkyWest filed its answer to the operative pleading on July 13, 2015 and an Amended Answer on August 7, 2015. Dockets ##72, 82.

The action proceeded through discovery, and SkyWest timely filed the present motion on February 4, 2016 arguing that the undisputed facts do not support Deneffe's gender stereotype claim or show any causal link between his alleged failure to conform to male stereotypes and SkyWest's reasons for his termination; also, SkyWest contends no facts exist showing Deneffe's age was a "but for" reason for his termination.

Deneffe counters generally that the evidence shows SkyWest's stated reason for terminating his employment is false and that, as a result of SkyWest's dissemination of the false reason, he has been unable to secure subsequent employment as a pilot. SkyWest replies that Deneffe's subjective opinion concerning his job performance does not establish pretext; inconsistencies in his training record do not support an inference of pretext; there are no shifting reasons for his termination; it was not mandated that SkyWest officials follow the progressive discipline policy for Deneffe's

termination; there is no evidence any ageist comments related to the termination decision; Captain Powers' evaluation was not the sole basis for the termination; Deneffe submits no facts establishing a pattern and practice ADEA claim; and SkyWest did not foster an environment of discrimination for gender stereotyping.

## II.     Findings of Fact

The Court makes the following findings of fact viewed in the light most favorable to the Plaintiff, who is the non-moving party in this matter.[2]

1.     Pursuant to the Pilot Records Improvement Act ("PRIA"), upon request from either the individual pilot or a potential air carrier employer, SkyWest is required to disclose the pilot's employment records, including records pertaining to discipline and termination.

2.     On March 5, 2013, Deneffe executed a consent form for the release of PRIA records for a job application with Global Exec Aviation.

3.     Deneffe believes that the reasons for his termination – "213, performance, ineligible for [re]hire" – contained in the PRIA records are false.

4.     At the time of his termination on June 7, 2012, Deneffe was 49 years old and was a probationary pilot at SkyWest because he had not completed a year of employment.

5.     As a probationary pilot, Deneffe was not entitled to submit an internal appeal of his termination.

6.     Probationary pilots are at-will employees. After probationary pilots are hired by SkyWest, they undergo an initial training period consisting of ground school, flight simulator training and initial operating experience ("IOE").

7.     As the Manager of Flight Standards for SkyWest, Captain Robin Wall is in charge of pilot

---

[2]Unless otherwise cited, these facts are undisputed.

training for the airline.

8.      IOE training consists of flying a SkyWest commuter jet under the supervision of a line check airman (an experienced captain). During IOE, a probationary pilot receives training from the line check airman. These flights are performed under normal operating conditions, flying regular routes with passengers. IOE training typically lasts between 35 to 40 flight hours.

9.      IOE requires that a line check airman debrief a pilot after every flight.  Deposition of Robin L. Wall, December 4, 2015 ("Wall depo"), 16: 22-25, docket #92-4.

10.     After completing IOE, probationary pilots must pass a line check, administered by a line check airman, before they are released to fly the line (regularly scheduled flights). A line check is an observation of crew or crew members in the performance of their duties as line pilots.

11.     If a probationary pilot is performing poorly, the chief pilot will review the probationary pilot's flight evaluations and depending upon the issue, may arrange for the probationary pilot to receive other operating experience ("OOE"). The Flight Standards Department will determine whether the probationary pilot will receive any additional training.

12.     Deneffe was hired by SkyWest in July 2011.  He also started ground school training at that time.

13.     Deneffe completed ground school in August 2011.

14.     On October 11, 2011, Deneffe had IOE training with Captain Alan Neben. Captain Neben noted, "Charles does a good job on the radio if given only one item (heading or frequency). But if the controller gives several things or asks question out of the normal flow, Charles has trouble keeping up with that. Overall, Charles is progressing well. He has the flying skills necessary to fly a jet. Experience will get him up to speed on the rest of the duties needed to be a good first officer at SkyWest."  OE Form, docket #92-7.

15.     Neben emailed Wall the following day saying, "Charles is progressing very well" and complimenting Deneffe on hand flying, pitch, power, FMS, and "the key pad." Docket #96-22. He also noted that Deneffe's "weakness is radio calls, setting the V speeds and getting everything set up in the busy push back stage," but concluded "he is improving quickly and I don't see any reason he won't be able to successfully complete IOE." *Id.*

16.     On October 15, 2011, Deneffe had IOE training with Captain Jack Kelly. Captain Kelly noted, "Charles is making slow progress and is struggling with the pace and workload during busy environments. Overall, his flying is good but his interface with the FMS/Autopilot hinders his flying ability. His descent planning and approach setup/execution need more consistency." *Id.*

17.     Deneffe passed a line check in October 2011 after finishing his IOE training.

18.     Once a probationary pilot passes his/her line check, the probationary pilot is expected to solicit 12 flight evaluations from captains with whom they have flown during the first year of their employment.

19.     Probationary pilots do not receive copies of their flight evaluations, but they can review them during their six-month and twelve-month evaluations.

20.     On January 30, 2012, Chief Pilot Graser ("Graser") met with Plaintiff to discuss his mid-year evaluation and "the Captain eval[uation]s [he] received." January 30, 2012 Email, docket #92-9. Deneffe thanked Graser for his time, expertise and comments, and stated "I already contacted several Captains I flew with to obtain additional reviews." *Id.*

21.     Captains Darren Miller, Gina Martyn, and Douglas Ringering submitted Probationary Pilot evaluations for Plaintiff's mid-year evaluation.

22.     SkyWest's Probationary Evaluations for pilots rate probationary pilots in two broad categories, Job Performance and Company Orientation. These categories are evaluated by a captain

or check airman on a scale of 1-5, with 1 being "excellent" and 5 being "poor."

23.     On November 15, 2011, Captain Miller rated Deneffe a "4" in three areas (2 in job performance), a "3" in three areas (all in job performance), and a "2" in the remaining six areas (1 in job performance).  Captain Miller noted, "For the most part, I found that Charles['] awareness and radio proficiency suffers because English is not his primary language. Particularly on our COS-DEN leg, which can be quite hectic, things were moving a little quick for him, particularly once on the ground. However, I would like to emphatically state that I do believe if given a reasonable chance, he will develop into a great crewmember and an asset to SkyWest airlines. The only caveat being that he will require some patience an the part of the Captains that he flies with until he gets some experience. My concern is that if he is paired up with an impatient, overly demanding Captain, sparks could fly and it might be a setback for Charles."  Probation Evaluation, docket #92-10.

24.     On January 2, 2012, Captain Martyn rated Deneffe a "4" in two areas (2 in job performance), a "3" in seven areas (3 in job performance), and a "2" in the remaining three areas (1 in job performance).  Captain Martyn noted, "Charles has a great attitude and tries hard. Areas to work on: Situational awareness could use improvement. Didn't realize that his rate of descent would have him 10,000'agl twenty miles past the airport in Tucson, and had to do a 360 to lose altitude. Also cleared for visual 16L in Denver, and lined up for 17R. When questioned on it, to make sure he was lining up correctly, he affirmed that he was headed to 16L. As we got more lined up, it was evident that he was looking at 17R, and he only realized it after I pointed out that 16L was to the right of the terminal area. I believe some of this stems from communications/understanding diffculties. I wouldn't want to fly in my nonexistent second language, and have sympathy, but I recommend that he really pay EXTRA attention to clearances, radio communications, and ATIS reports, and making sure he truly UNDERSTANDS what they mean."  Probation Evaluation, docket #92-11.

25.     On January 5, 2012, Captain Ringering rated Deneffe a "5" in two areas (1 in job performance), a "3" in two areas (all in job performance), a "2" in two areas (all in job performance) and a "1" in the remaining six areas (1 in job performance).  Captain Ringering noted, "Charles was great to fly with and is extremely motivated. There is a language barrier and he was having a difficult time talking to ATC, mostly ground control. KIAH was one of them, and the controller had a thick southern accent which exacerbated the communication gap. I gave Charles some recommendations and he was very receptive. With proper support I feel he will overcome the communication struggle. His motivation and people skills are in line with the Skywest culture." Probation Evaluation, docket #92-12.

26.     At the mid-year evaluation, during Graser's discussion with Deneffe about his performance, Deneffe told Graser that he believed his performance was improving.  Graser told Deneffe that "he did not take Ms. Martyn very seriously because she was a new captain or something of the same, saying that he didn't take her evaluation seriously."   Deposition of Frederic Charles Deneffe, December 10, 2015 ("Deneffe depo"), 73: 13-17.

27.     Also at the mid-year evaluation, Graser told Deneffe that Deneffe was "older than the regular first officer" and was "the same age as a lot of the Captains," but he did not say that was a "bad thing."  Deneffe depo, 88: 4-25, 89: 1-14.  The meeting took place in Graser's office with the door open and lasted no longer than 10 minutes.  *Id.*, 86: 20-25.  Deneffe felt "relaxed" and characterized the meeting as "debonair."  *Id.*, 86: 2-17.

28.     Deneffe did not tell Graser that he was gay, and Graser never asked Deneffe about his sexual orientation.

29.     After the evaluation, Deneffe received six additional evaluations from captains for the period January 30 - February 20, 2012.  *See* docket #96-15.  None of these evaluations contained a "4" or

"5" rating in any area. *Id.*

30.    A male SkyWest captain used the term "faggot" in Deneffe's presence, but Deneffe does not recall who made this comment, nor were there any witnesses to this comment, nor did he object to this comment being made, nor did he make a complaint about this alleged comment. Deneffe depo, 136: 25, 137: 1-18; 138: 2-25, 139: 1-11.

31.    Deneffe said that he did not make a complaint because he was scared and did not want to lose his job.  Deneffe claimed that he did not know SkyWest had an anti-retaliation policy, but he admitted to signing the acknowledgment for SkyWest's Employee Handbook, which contains anti-discrimination and anti-retaliation policies.

32.    Deneffe clarified that the term was not used against him so he was not personally insulted, but it was used in his presence.  Deneffe depo., 139: 21-25.

33.    Deneffe never heard Graser refer to anyone as a "faggot," nor did anyone ever tell him that Graser had referred to anyone by that term.

34.    Deneffe never heard any of the pilots that performed his evaluations use the term "faggot" in his presence.

35.    Deneffe heard SkyWest pilots use the term "Suzie" in his presence to make fun of male flight attendants.

36.    Deneffe never heard Graser refer to anyone as a "Suzie," nor did any other employees claim that they heard Graser refer to individuals as "Suzie."

37.    Deneffe never heard Graser make any derogatory comments about homosexuals.

38.    While he worked at SkyWest, Deneffe did not tell anyone he was gay.  Deneffe depo, 143: 16-18.

39.    A male pilot told Denefee, "I am not getting laid this trip, and I'll make sure I double lock

my room," when only male attendants were on a flight.

40.     Deneffe could not remember which pilot made this comment, or when it was made.  He confirmed that there were no witnesses to this comment, and that he was not offended by the comment, nor did he make a complaint about it.  Deneffe never heard this pilot making any derogatory references about gays to Graser.  Deneffe depo, Tr.146: 13-21; 147: 7-11; 148: 1-7.

41.     Deneffe never heard any derogatory references about gays or homosexuals from any of the other captains that evaluated him to Graser.

42.     Deneffe was "conspicuously silent" when his male co-workers discussed their sexual exploits with women, made homosexual jokes or talked about their wives and children.  He "felt out of place," because he could not discuss his sexual performance or sexual orientation during these conversations.

43.     However, Deneffe felt he "had to respond by joking with them" about their exploits.  Deneffe depo, 150: 19-25, 151: 1-11.

44.     While employed at SkyWest, Deneffe never complained to anyone in management or human resources about homophobic remarks that were made in his presence.  He "was scared to talk about any gay issues because of what [he] heard Gina Martyn that had -- that the captain told her she was going to burn in hell, and I didn't want to be targeted as a gay pilot, and I didn't want -- I wanted to keep it low profile."  *Id.*, 142: 8-15.

45.     As a SkyWest pilot, Deneffe received flight benefits that allowed his designated beneficiaries to either fly for free or for reduced airfares.

46.     Deneffe designated his parents and Riku Doi as recipients for his flight benefits. Mr. Doi was Deneffe's boyfriend, but he identified Doi as his friend on the flight benefits form.  Deneffe did not submit any other documents to SkyWest identifying Doi as his spouse or boyfriend.

47.     Deneffe took several trips with Doi and he claims that many SkyWest pilots saw them traveling together while they were waiting for the flights, but he could not identify the pilots. Deneffe depo, 158: 14-23.  Deneffe did not recall whether he was holding hands with Doi, and he did not engage in other public displays of affection with Doi.  *Id.*, 159: 5-9.

48.     On March 26, 2012, Captain Daniel Harper emailed Graser concerning Harper's flight with Deneffe and stated,

> First I'd like to say Charles is a pleasure to fly with, as he has a great personality, is very smart, and has a very positive attitude. I'm convinced he seeks to do a great job when he comes to work. I do still believe he is lacking proficiency in several areas, which are listed below:
>
> 1. Airspeed awareness and control.
> 2. FMS procedures.
> 3. Crosswind takeoff and landing awareness and control.
> 4. ATC communication and procedures (his native language is French, although his English is fine. The problem was not his English, rather his ability to hear ATC calls and respond in a timely fashion and with correct responses.)
> 5. Easily becomes task saturated.
>
> I chose to discuss these items with him on my own, and we had a great conversation about them, and he improved over the course of our four[-]day trip. He was very receptive to the mentoring and help I tried to give him. I told him I thought he may not have been flying enough since getting off IOE, and lost proficiency and sharpness in these areas, and that he needs to feel comfortable telling you and Skywest that he may be losing proficiency and needs additional flying, especially at this early stage in his career. I'll suggest to you, too, to please help him get some more trips soon and keep him flying solid for a month or so. I think if he got good reps he'll continue to improve. Anyways, please let me know if I can be of further help in this matter, and I'll talk to you soon, Rob.

March 26, 2012 Email, docket #92-15.

49.     Deneffe did not agree with Captain Harper's recollection of Harper's flight with Deneffe. However, he recalled discussing the above-listed items with Harper "informally" after the flight "at the hotel, having a drink."  Deneffe depo, 97: 3-25, 98, 99: 1-12.

50.     That same day, Graser emailed Captain Wall in the Training Department to see whether Wall

could arrange additional OOE training or a line check for Deneffe. Graser stated, "Some of the safety concerns of airspeed control and crosswind procedures caught my attention. When Danny [Harper] called he mentioned other Captains were having some issues also but I have not heard from any of them." March 26, 2016 Email, docket #92-17. Wall responded the same day that he would "get him some flying with a check airman for evaluation." Docket #96-14.

51.     On April 9, 2012, Graser received an email from Captain John Tennyson concerning a recent two-day trip Tennyson had with Deneffe:

> Here is a quick recap of some of the weakness[es] I saw with Charles on the two day trip with [sic] just completed. -Very weak radio communications. Seems to stem from English being his second language. He would answer most radio calls with "Roger" and then ask me what ATC had instructed. -Poor descent planning. All descents were conducted at 3000ft/min as soon as instructions from ATC were given. For example, on our flight in MTJ, we were given a PD to 17K and Charles immediately started down at 3000ft/min which would have put us just 2000 feet above the mountainous terrain at night and still 90 miles from the airport. I tried to give a quick lesson on descent planning and building a 30sm ring and he seemed to be a little overloaded and not absorbing. -After being cleared for a visual approach into Denver, Charles turned the autopilot off and lined up for runway 34L when we were actually cleared for 35L. -Charles had a hard time with uncontrolled airport operations including radio communications on CTAF and getting clearance from Denver Center. -Charles tends to fly the plane in a reactionary manner, by that I mean he waits for the aircraft to be put into an undesired position and then tried to fix the problem. This is opposed to being proactive and making adjustments to prevent [sic] to the aircraft before an undesirable position occurs. For example Charles waits for a X-Wind to push the plane off centerline before making an adjustment as opposed to putting in proper correction before the problem even starts. Charles does have a great attitude and is extremely friendly with passengers and crew.

April 9, 2012 Email, docket #92-18. Graser forwarded this email to Wall that same day. Docket #96-14.

52.     Deneffe does not recall the specific details of his flight with Tennyson.

53.     During Deneffe's flight with Tennyson, Deneffe's age and sexual orientation were not discussed.

54.     Wall asked Captain Malcolm Powers to perform an evaluation assessment of Deneffe's flying skills and ability.

55.     On May 15, 2012, Powers emailed Wall with Powers' report of his flight with Deneffe listing nine areas of concern and noting he was "concerned that [Deneffe] has been he[re] for almost a year and is still struggling."  May 15, 2012 Email, docket #92-19.  Powers recommended to Wall that Deneffe "be given a random line check from another check airman to see if [Deneffe] was 'having a bad day' or 'days' when he flew with me."  *Id.*

56.     During Deneffe's flight with Powers, Powers told Deneffe that "he was too old to join the airlines," and that "after a certain age, you probably won't get a chance."   Deneffe did not lodge a complaint against Powers for making these statements.  Deneffe depo, 123: 9-25, 124: 1-3.

57.     Deneffe does not recall Powers making any homophobic comments during the flight.

58.     Wall made the decision not to offer Deneffe additional training based on the observations of check airmen and other pilots, as well as the amount of time Deneffe had with the company and the amount of training he had been provided.  *Id.*, 58: 19-25, 59: 1-4.  Deneffe never met Wall and had "no idea how [Wall] could know" he was gay.  Deneffe depo, 160: 14-25.

59.     Wall discussed Powers' report with Graser outlining the amount of training Deneffe had received and opining that he "didn't see any reason to continue training based on the fact that [Deneffe] wasn't able to maintain the skill sets that we ... require from our pilots."  Wall depo, 51: 13-25, 52: 1-3.

60.     Graser did not discuss Powers' evaluation with Deneffe, "[b]ecause we had already determined at this point that he's a problem. I mean we're already at the point where – me, personally, as a chief, my responsibility is to make sure that the line is safe. So at this point, I determined that we can't keep him in a situation as an active pilot on the line anymore."

61.     On June 1, 2012, Deneffe made a note in his log book that it was his "first flight as a line holder with [a] trip I chose with my favorite Captain Chris Anthenian."  Docket #96-13 at 28-29.

62.     Graser discussed the possible termination of Deneffe with Shane Losee, SkyWest's Director of Operations, to whom Graser reported.  Deposition of Marcus Shane Losee, December 3, 2015 ("Losee depo"), 29: 5-16.  Graser informed Losee of his concerns regarding Deneffe's "extended training period," "performance reports showing no progress," and Deneffe's "lack of situational awareness," and told Losee he "felt it was a safety issue."  *Id.*, 33: 6-17; 35: 12-16.  Graser recommended that Deneffe be terminated and Losee concurred with this recommendation.

63.     Graser also contacted Cheryl Sachse, SkyWest's Employee Relations Manager for Flight Operations, to discuss the recommendation to terminate Deneffe's employment.  Deposition of Cheryl Sachse, December 3, 2015 ("Sasche depo"), 42: 16-21.  Sachse testified that "anytime there's a termination, they [supervising pilots] contact me to look at documentation to preview the information."  *Id.*, 43: 10-14.  In this circumstance, Sachse reviewed Deneffe's training hours and flight evaluations then, "spoke[ ] to Rob Graser on the information that was provided to [her] and ma[d]e a recommendation based off of that information and the recommendation from Robin Wall."  *Id.*, 44: 3-12.  She concurred with Wall's recommendation of Deneffe's termination. *Id.*, 44: 25, 45: 1-9.

64.     Sachse confirmed that SkyWest employs a progressive discipline, or "step action," policy where "you start at the lowest level and move to the highest level."  *Id.*, 31: 7-16.

65.     Todd Eichwald of Horizon Air emailed Graser on May 29, 2012, informing him that Deneffe had been removed from a flight – on which Deneffe was a passenger – for "disruptive behavior" including "making derogatory comments about the turbo-prop aircraft in general and Horizon's

aircraft in particular." Docket #96-4.  Graser forwarded the email to Sachse on June 4, 2012, saying Deneffe "is the one they want to terminate based on performance. ... He is on my 'to do list' this week." *Id.*

66.     Graser made the decision to terminate Deneffe's employment.  SkyWest Response to Interrogatory No. 9, docket #96-5.

67.     On June 4, 2012, Graser emailed Wall saying, "I am in the process of putting the termination together for Charles Deneffe. I would like to get a statement or email from the check airmen that flew with him after the complaints came in if I can."  Docket #96-12.  Wall responded to Graser the next day informing him that "[m]ost of the conversations with check airman [sic] were by phone during his OE" and Deneffe had "approx. 75 hours IOE and 50 hours OOE afterwards. Because of the concerned feedback after OE was complete, I had Shelli add to his flying schedule and this continued for several weeks." *Id.*; *see also* docket #92-21.

68.     On June 7, 2012, Graser and Sachse (via telephone) met with Deneffe to inform him of the decision to terminate Deneffe's employment.   Graser explained to Deneffe that Deneffe's performance had not improved and that his employment was being terminated.  Graser did not discuss Deneffe's age or sexual orientation during the termination meeting.

69.     Graser completed Deneffe's Termination/ Final Check Request paperwork, indicating that Deneffe was terminated for performance.  Docket #92-23.  The Termination/ Final Check Request identified the termination code as "213 Performance/ Inability; Involuntary, Ineligible for Rehire." *Id.*

70.     However, on a SkyWest spreadsheet listing persons "terminated" for the period 2011-2014 and on what appears to be SkyWest's computer profile of Deneffe, Deneffe's "termination reason" is "Fail RTW [return to work] Requirements." *See* dockets ##96-8 and 96-20.

71.     According to a June 14, 2012 email to Sachse, Graser reported that Deneffe received 70.40 hours of IOE training and 14.33 hours of OOE training.  Docket #92-8.

72.     On June 14, 2012, Deneffe wrote an email to Sachse saying, "Hello, Cheryl. First of all, thank you for your time and for being so kind. After we talked, I went to check my log book, and nothing that Skywest says makes any sense. I was told I've got over 75 hours of IOE. This [sic] absolutely not true. I got signed off for IOE on October 28, 2011, with exactly 34.8 hours on a CRJ-200 on the day I got signed off. So saying I got 75 hours is a lie and I -- and also all the flights after that were regular flights. Nobody gave me a debrief saying, okay, you are good or bad, nothing. Furthermore, if I am already signed off, it is not IOE anymore. It's per the FAA."  Deneffe depo, 187: 9-25.

73.     In response to this email, Todd Emerson, Skywest Director of the Legal Department, wrote Deneffe a letter in which he describes Deneffe's training hours as follows: "After your trip beginning October 25, 2011, you completed a cumulative total of 60.48 IOE hours. On October 30, 2011 you began additional mandated training through OOE's that gave you an additional 19.21 OOE hours. ... Records indicate that you completed training sessions on November 3, 2011 with 81.07 hours of IOE or OOE training."  Docket #96-11.

74.     Deneffe's log book reveals that, from October 5, 2011 through November 3, 2011, he logged a total of 81.4 flight hours.  Docket #96-13 at 2-6.  According to the book, all flights were on a CRJ-200 jet.  *Id.*

75.     Deneffe alleges that SkyWest did not follow its disciplinary procedures.  Deneffe testified he "never got a strike, a second strike, nothing. I never saw the chief pilot the whole time I was working there, not a single time except for my six-month review."

76.     In addition, while Deneffe "got feedback while flying, [he] never got some briefing regarding

any problems or performance issues." Deneffe depo, 84: 10-15. He explains "briefing" as "after a flight, the flight has been completed, and we sit down with the captain, and he explains what things really have to be worked on." *Id.*, 84: 19-24.

## LEGAL STANDARDS

A motion for summary judgment serves the purpose of testing whether a trial is required. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003). The Court shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The moving party bears the initial responsibility of providing to the Court the factual basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The moving party may carry its initial burden either by producing affirmative evidence negating an essential element of the nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial." *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002). Only admissible evidence may be considered when ruling on a motion for summary judgment. *World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985).

The non-moving party has the burden of showing there are issues of material fact to be determined. *Celotex*, 477 U.S. at 322. That is, if the movant properly supports a motion for summary judgment, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing a genuine factual issue for trial. Fed. R. Civ. P. 56(e); *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("[t]he mere existence of *some* alleged factual dispute

between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.") (emphasis in original) (citation omitted); *see also Hysten v. Burlington Northern & Santa Fe Ry.*, 296 F.3d 1177, 1180 (10th Cir. 2002). These specific facts may be shown "'by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves.'" *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 324). "[T]he content of summary judgment evidence must be generally admissible and . . . if that evidence is presented in the form of an affidavit, the Rules of Civil Procedure specifically require a certain type of admissibility, *i.e.*, the evidence must be based on personal knowledge." *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005). "The court views the record and draws all inferences in the light most favorable to the non-moving party." *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005).

## ANALYSIS

Deneffe's termination of employment claims were dismissed as time-barred on January 16, 2015 (docket #47) and, therefore, the only claims remaining allege that SkyWest discriminated against Deneffe based on age and sex when it submitted a negative and, allegedly, untrue employment reference/report pursuant to the PRIA. On May 11, 2015, the Court denied SkyWest's motion to dismiss Deneffe's amended claims finding his allegations were sufficient to state plausibly that the alleged action by SkyWest of submitting PRIA forms (after Deneffe's termination of employment) containing negative employment information that is distributed to potential employers was "adverse" under Title VII and the ADEA, and that the chief pilot submitted a negative PRIA employment reference based on Deneffe's age and his failure to conform to male stereotypes.

Here, SkyWest argues that the undisputed facts demonstrate Deneffe could not have suffered

discrimination for failing to conform to male stereotypes or because of his age, where he admits none of the decisionmakers knew he was gay and the alleged ageist comments were simply "stray" and unrelated to any employment decisions.  Deneffe counters that SkyWest engages in a pattern and practice of discriminating against older probationary pilots, and Graser, the decisionmaker, made ageist comments at Deneffe's six-month review and during his own deposition, and/or relied on the recommendation of a pilot who also made ageist comments; and regarding his sex claim, Deneffe argues he is not claiming harassment, but that SkyWest fostered an atmosphere of discrimination against males who did not conform to stereotypes, and he was offended by the comments and jokes made by pilots about male flight attendants.  Deneffe also contends genuine issues of material fact exist as to whether SkyWest's reason for his termination is a pretext for discrimination.

"A plaintiff proves a violation of Title VII either by direct evidence of discrimination or by following the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed.2d 668 (1973)."  *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012).  The same analysis is used in the adjudication of claims under the ADEA.  *Jones v. Okla. City Public Schs.*, 617 F.3d 1273, 1278-79 (10th Cir. 2010).

Here, as in many cases, there is no "direct" evidence of discrimination,[3] so the Court will proceed using the indirect method of proof.  "[The] *McDonnell Douglas* ... three-step analysis requires the plaintiff first prove a *prima facie* case of discrimination."  *Id.*  Typically, to establish

---

[3]To the extent Deneffe asserts his proffered examples of discrimination constitute "direct" evidence of discrimination, the Court disagrees.  Direct evidence is evidence that "demonstrates on its face that the employment decision was reached for discriminatory reasons." *Danville v. Reg'l Lab Corp.*, 292 F.3d 1246, 1249 (10th Cir. 2002).  "'A statement that can plausibly be interpreted two different ways – one discriminatory and the other benign – does not directly reflect illegal animus, and thus, does not constitute direct evidence.'" *Hall v. U.S. Dep't of Labor*, 476 F.3d 847, 855 (10th Cir. 2007) (quotation omitted).

a *prima facie* case, "a plaintiff must establish that (1) [he] is a member of a protected class, (2) [he] suffered an adverse employment action, (3) [he] was qualified for the position at issue, and (4) [he] was treated less favorably than others not in the protected class." *Id.*  If Deneffe makes out a *prima facie* case, "[t]he burden then shifts to the defendant to produce a legitimate, non-discriminatory reason for the adverse employment action." *Id.*  If SkyWest meets that burden, "the burden then shifts back to the plaintiff to show that [his] protected status was a determinative factor in the employment decision or that the employer's explanation is pretext." *Id.*

The Court will begin with an analysis of whether genuine issues of material fact exist concerning Plaintiff's Title VII claim, then proceed to determine the same for his ADEA claim.

## I.      Title VII

For a sex discrimination claim under Title VII, the plaintiff must show, among other things, that he was discriminated against because of his sex. *Harsco Corp. v. Renner*, 475 F.3d 1179, 1186 (10th Cir. 2007).  To succeed on his discrimination claim here, Deneffe must first establish a *prima facie* case. *See, e.g., Barlow v. C.R. England, Inc.*, 703 F.3d 497, 505 (10th Cir. 2012) ("If the plaintiff does not establish a prima facie case, his entire case fails.").  However, at this stage, the Court need not engage in a comprehensive analysis of each element, particularly where the movant has not challenged them.  Rather, "'[t]he critical prima facie inquiry in all cases is whether the plaintiff has demonstrated that the adverse employment action occurred under circumstances which give rise to an inference of unlawful discrimination.' . . . [T]he plaintiff's articulation of his prima facie case may vary depending on the nature of the claim." *Id.* (quoting *Plotke v. White*, 405 F.3d 1092, 1100 (10th Cir. 2005)).

Both parties acknowledge that the Tenth Circuit has not recognized a Title VII claim for discrimination based on sexual orientation, and that Deneffe's Title VII claim is premised on

Deneffe's failure to conform to gender stereotypes. While the Tenth Circuit has not decided whether discrimination based on an employee's failure to conform to sex stereotypes always constitutes discrimination "based on sex," the court has assumed that a transsexual who alleged, as a biological male, she did not act or appear as a male is expected to act or appear established a *prima facie* case of gender stereotyping under a Rule 56 analysis. *Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1224 (10th Cir. 2007).

SkyWest argues there is no evidence that any SkyWest decision makers had any belief or perception that Deneffe failed to conform to traditional male gender stereotypes. The Court agrees that a reasonable juror could not conclude on the evidence presented that SkyWest submitted a negative, "false" PRIA employment reference "under circumstances giving rise to an inference of unlawful discrimination" under Title VII.

Again, for his stereotyping claim, Deneffe must show the employer discriminated against him based on his "failure to conform to stereotypical gender norms." *Etsitty*, 502 F.3d at 1223. Deneffe asserts that the evidence demonstrates he was "conspicuously silent" when other male pilots chatted about their families and sexual exploits with females. However, there is no evidence that any of these conversations took place with (as Deneffe characterizes him) the "undisputed decision maker," Chief Pilot Graser. In fact, Deneffe contends that he met Graser only twice – first, at his six-month review, which lasted no more than 10 minutes and at which they "did not discuss anything else" (Deneffe depo, 88: 20-25) and, second, at his termination meeting. Deneffe does not proffer any evidence that he and Graser engaged in conversations that might cause Graser to perceive him as failing to conform to male stereotypes.

Nor does Deneffe contend that he had such conversations with Captain Powers, whom he argues influenced Graser. There is no other evidence giving rise to an inference that Powers

perceived Deneffe as failing to conform to male stereotypes.  Notably, Deneffe asserts he never met Captain Wall and, thus, he had "no idea how [Wall] could know" he was gay.  Deneffe depo, 160: 14-25.  The Court finds Deneffe's "conspicuous silence" does not demonstrate genuine factual issues.

Deneffe also argues that SkyWest "fostered an environment of discriminatory animus for gender stereotyping" in that its captains "referred to men they perceived to not conform to heterosexual gender stereotypes as 'faggots' and 'Susie.'" The Court is skeptical that the captains' comments (assuming they were made) "fostered an environment of discriminatory animus" where Deneffe testified that it was only one captain (someone who did not perform his evaluations) who used the term, "faggot," in his presence and he was not offended by it (Deneffe depo, 138: 6-8; 139: 23-25), and where he testified that "Susie" was used "not more than five [times], but a few times" and is "not a term that upsets me" (*id*, 140: 24-25, 141, 142: 1).  Nevertheless, while sex stereotyping may constitute evidence of sex discrimination, "[r]emarks at work that are based on sex-stereotypes do not inevitably prove that gender played a part in a particular employment decision. The plaintiff must show that the employer actually relied on [the plaintiff's] gender in making its decision." *Spearman v. Ford Motor Co.*, 231 F.3d 1080, 1085 (7th Cir. 2000) (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989)).

Deneffe argues further that he and his domestic partner, Riku Doi, traveled frequently together on SkyWest flights, and he named Doi as a beneficiary for his employment benefits. However, he identified Doi as his "friend" on the flight benefits form and did not submit any other documents to SkyWest identifying Doi as his "spouse" or "boyfriend."  In addition, while Deneffe claims that "many" SkyWest pilots saw them traveling together while they were waiting for the flights, he could not identify any of the pilots (Deneffe depo, 158: 14-23) and did not know whether

21

Graser or other evaluating pilots were among them (*id.*, 158: 24-25, 159: 1-4), he did not recall whether he was holding hands with Doi, and he did not engage in other public displays of affection with Doi (*id.*, 159: 5-9). Deneffe did testify that he "assumed" Powers knew Doi was his boyfriend because Deneffe was with Powers when he met Doi at the airport, but Deneffe did not introduce Doi nor did Powers see Deneffe greet Doi and Powers "did not talk to us." *Id.*, 136: 2-24. This evidence fails to give rise to an inference that anyone at SkyWest perceived that Deneffe failed to conform to male stereotypes.

Finally, Deneffe contends that a male captain at SkyWest, upon learning after Deneffe's termination from SkyWest that Deneffe was gay, stated he was "not surprised" to learn Deneffe was gay. However, while this information may support an inference that SkyWest personnel perceived Deneffe to be homosexual, it does not support an inference that he failed to conform to male stereotypes. *See Etsitty*, 502 F.3d at 1222 ("[T]his court has explicitly declined to extend Title VII protections to discrimination based on a person's sexual orientation.") (citing *Medina v. Income Support Div.*, 413 F.3d 1131, 1135 (10th Cir. 2005)).

Without evidence creating an inference that Graser, or even Powers or Wall, perceived Deneffe as failing to conform to male stereotypes, the Court must conclude that Deneffe has failed to demonstrate a *prima facie* case under Title VII.

## II.   ADEA

However, the Court finds Deneffe has shown factual issues exist concerning whether SkyWest submitted a "false" negative employment reference based on his age.

### A.   *Prima Facie* Case

It is undisputed that Deneffe was over the age of 40 when the events described in the operative pleading occurred. As for whether the "adverse action occurred under circumstances

which give rise to an inference of discrimination,"[4] the evidence reflects Deneffe's testimony that

Graser told Deneffe, during the mid-year evaluation and without provocation, that Deneffe was

"older than the regular first officer" and was "the same age as a lot of the Captains." Deneffe depo,

87: 14-25. Further, Powers, whose evaluation allegedly influenced Graser's termination decision,

told Deneffe during the evaluation flight that "he was too old to join the airlines" and that "after a

certain age, you probably won't get a chance." Deneffe depo, 123: 9-25, 124: 1-3. Finally, Deneffe

has produced documents reflecting SkyWest's admission that "the average age for SkyWest's First

Officers at the time [Deneffe joined the airline] was approximately 25 years old" (Amended

Complaint, ¶ 7; Amended Answer, ¶ 7), but the average age of probationary pilots who were

terminated from SkyWest between 2011-2014 was 41.9 years old (Responses to Interrogatories No.

9 and 24, docket #96-5; docket #96-8).[5]

SkyWest argues that the evidence demonstrates no causal connection between the comments

and Deneffe's termination sufficient to raise an inference of discrimination. However, "[a]ge-related

comments referring directly to the worker may support an inference of age discrimination." *Cone*

*v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 531 (10th Cir. 1994). Although isolated comments

that are unrelated to the challenged action do not show discriminatory animus by themselves, the

---

[4]In *Plotke*, as here, "where an employer contends the actual reason for termination in a discriminatory firing case is not elimination of the employee's position but, rather, unsatisfactory conduct, the status of the employee's former position after his or her termination is irrelevant." 405 F.3d at 1100. Thus, Deneffe need not proffer evidence as to the fourth element of a typical ADEA prima facie case that he was replaced by a younger person. *Id.*

[5]In response to Deneffe's Interrogatory No. 24, SkyWest provided the dates of birth and ages of the terminated pilots listed on docket #96-8. It appears that Deneffe relies solely on the ages provided to calculate the "average age" of 41.9. Although a reasonable inference, the Court considered the actual dates of birth of each pilot listed and determined the average age at termination is about 39. However, SkyWest does not dispute Deneffe's calculation and the Court is required to consider the facts in the light most favorable to Deneffe. Thus, for purposes of this motion only, the Court will accept Plaintiff's proffered calculation.

necessary causal nexus may be shown if the allegedly discriminatory comments were directed at the plaintiff. *See Rea v. Martin Marietta Corp.*, 29 F.3d 1450, 1457 (10th Cir. 1994) (citing *Cone*, 14 F.3d at 531-32). SkyWest relies on the Tenth Circuit's opinion in *Rea* for its position; however, in that case, the comments on which the plaintiff relied were either ambiguous or not directed at her. *See id.* Here, the challenged comments were directed at Deneffe and were made within the context of the events that led to Deneffe's termination[6]; it will be up to a jury to decide whether age motivated the decisions to terminate him and to submit the negative, "false" reference.

SkyWest also contends that "Graser did not solely rely on Captain Powers' evaluation" in deciding to terminate Deneffe, then argues that Deneffe cannot demonstrate discrimination through the "cat's paw" theory.[7] However, the Court finds the use of a subordinate-bias theory[8] to establish discrimination unnecessary in this case, where (viewing the facts in the light most favorable to Deneffe) the decision maker himself has allegedly directed age-related comments at Deneffe. Rather, where "particular age-related comments [by a nondecisionmaker who may have influenced the adverse decision] do not establish the requisite pretext by themselves, they may support other evidence to raise an inference of discrimination." *Barnes v. Foot Locker Retail, Inc.*, 476 F. Supp. 2d 1210, 1215-16 (D. Kan. 2007) (citing *Miller v. Eby Realty Group LLC*, 396 F.3d 1105, 1114

---

[6]SkyWest argues that Deneffe's "poort job performance ultimately led to his termination" and such "performance problems began during IOE training" and "continued as identified in his mid-year review." Motion, docket #92 at 20-21.

[7]"In the employment discrimination context, "cat's paw" refers to a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *E.E.O.C. v. BCI Coca-Cola Bottling Co.*, 450 F.3d 476, 484 (10th Cir. 2006).

[8]"To prevail on a subordinate bias claim, a plaintiff must establish more than mere 'influence' or 'input' in the decisionmaking process. Rather, the issue is whether the biased subordinate's discriminatory reports, recommendation, or other actions *caused* the adverse employment action." *Id.* at 487 (emphasis added).

(10th Cir. 2005)).

Finally, SkyWest asserts that Deneffe has failed to submit facts to support a pattern and practice ADEA claim. The Court agrees; in fact, at least one court in this circuit has found that the "pattern-or-practice method of proving discrimination ... is not available to individual plaintiffs." *DeWalt v. Meredith Corp.*, 484 F. Supp. 2d 1188, 1197 (D. Kan. 2007) (citing *Bacon v. Honda of Am. Mfg., Inc.*, 370 F.3d 565, 575 (6th Cir. 2004) and *Lowery v. Circuit City Stores, Inc.*, 158 F.3d 742, 761 (4th Cir. 1998), *vacated on other grounds*, 527 U.S. 1031 (1999)). However, this finding is not fatal to Deneffe's individual age discrimination claim. *See Thompson v. Weyerhaeuser Co.*, 582 F.3d 1125, 1127 (10th Cir. 2009) (describing the different analyses necessary to adjudicate "pattern-or-practice" cases, as opposed to "individual discrimination" cases). Deneffe need not assert a "pattern-or-practice" claim to proffer evidence of the average age of terminated probationary pilots during the relevant period. *See DeWalt*, 484 F. Supp. 2d at 1197 ("an individual may use evidence of a pattern or practice of discrimination to help prove claims of individual discrimination within the *McDonnell Douglas* framework") (citing *Mendelsohn v. Sprint/United Mgmt. Co.*, 466 F.3d 1223, 1227 n. 2 (10th Cir. 2006)). Thus, the Court finds the proffered evidence – age-related comments and ages of terminated probationary pilots – sufficient to raise an inference of age discrimination.

B.    Pretext

According to *McDonnell-Douglas*, once a plaintiff has demonstrated a *prima facie* case, the burden shifts to the defendant to proffer a legitimate, nondiscriminatory reason for the challenged action. Here, SkyWest asserts that it is required by the Pilot Records Improvement Act of 1996, as amended, 49 U.S.C. § 44703(i)(2)(B) ("PRIA"), to disclose the reasons for termination of a pilot's employment to potential third-party employers. Deneffe does not dispute this statutory requirement;

25

however, he asserts that SkyWest disclosed "false" reasons for his termination based on his age.

"[P]retext can be shown in a variety of ways," and "there is no one specific mode of evidence required to establish the discriminatory inference." *Conroy v. Vilsack*, 707 F.3d 1163, 1172 (10th Cir. 2013) (quoting *Trujillo v. PacifiCorp*, 524 F.3d 1149, 1158 (10th Cir. 2008)). Generally, "a plaintiff can establish pretext by showing the defendant's proffered non-discriminatory explanations for its actions are so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude [they are] unworthy of belief." *E.E.O.C. v. C.R. England*, 644 F.3d 1028, 1038-39 (alteration in original) (quoting *Johnson v. Weld Cnty.*, 594 F.3d 1202, 1211 (10th Cir. 2010)) (internal quotation marks omitted).

Notably, Deneffe proffered no factual evidence concerning SkyWest's disclosure of the PRIA employment reference; however, it appears to be undisputed that SkyWest made such disclosure for the reasons set forth in Deneffe's termination form: "213 Performance/Inability; Involuntary; Ineligible for Rehire." Motion, docket #92 at 1. Deneffe contends that these reasons are false and, thus, the Court must determine whether he has demonstrated material factual issues supporting his contention.[9]

---

[9]The Court notes that Deneffe appears to argue improperly that the challenged adverse action in this case is his termination of employment. For example, Deneffe contends that "SkyWest cannot establish without a genuine dispute of material fact a legitimate business reason for Deneffe's termination, supporting a finding of pretext." Response, docket #96 at 42. However, as set forth herein, Deneffe's remaining claims are not based on his termination, but on the submission of the PRIA reference. Therefore, under *McDonnell-Douglas*, while Deneffe must demonstrate material factual issues concerning the "falsity" of the termination reason to establish his theory of discrimination, SkyWest need not proffer a legitimate, non-discriminatory reason for Deneffe's termination under the burden-shifting framework. In addition, the Court need not consider whether SkyWest properly utilized its progressive disciplinary policy in terminating Deneffe. Such consideration would be relevant only where a plaintiff must demonstrate the termination decision is a pretext for discrimination. Here, Deneffe's theory asserts that SkyWest, motivated by age, submitted the PRIA reference containing a "false" reason for Deneffe's termination. Accordingly, Deneffe must demonstrate material factual issues as to whether his job performance at SkyWest was "poor" – i.e., whether, despite an extended training period, Deneffe showed no progress and he lacked certain flight skills, which raised safety concerns.

SkyWest contends that Deneffe's "job performance problems began during IOE training," "continued as identified in his mid-year review," and "actually became more pronounced and demonstrated that he was regressing" after the review.  Motion, docket #92 at 20-22.  SkyWest's evidence supporting its position includes evaluations made by trainers during IOE, three probationary pilot reviews discussed during Deneffe's mid-year evaluation, two "complaints" made by SkyWest captains who flew with Deneffe, and Powers' evaluation after flying with Deneffe.  *Id.*  In addition, Graser testified that he based the termination decision on Deneffe's "extended training period," "performance reports showing no progress," and his "lack of situational awareness," and told his supervisor, Losee, he "felt it was a safety issue."  Losee depo, 33: 6-17; 35: 12-16.

First, to demonstrate the falsity that Deneffe underwent an "extended training period," Deneffe argues SkyWest's training records are "conflicting and inaccurate."  SkyWest responds that, despite inconsistencies, all records still reflect that Deneffe received "almost double the IOE training afforded other probationary pilots."  Reply, docket #99 at 4.

Captain Wall, who supervised the training for probationary pilots, testified that the average number of training hours afforded probationary pilots is 35-40.  Wall depo, 16: 9-14.  Deneffe does not dispute this testimony, but contends that his flight log book reflects he had 34.8 hours of training before he passed his line check on October 28, 2011.  *See* Response, docket #96 at 12; *see also* Deneffe depo: 187: 7-25 ("I got signed off for IOE on October 28, 2011, with exactly 34.8 hours on a CRJ-200 on the day I got signed off").

Deneffe submitted a copy of his log book which reflects his flight hours during his employment at SkyWest, starting on October 5, 2011.[10]  Docket #96-13.  Under a column listed

---

[10]Notably, Deneffe did not provide the Court with instruction or explanation for interpreting the log book; thus, the Court looks to the plain and logical meaning of the log book's terms and entries.

"Total Duration of Flight," Deneffe logged his flight hours by hand for each point of departure and arrival. *Id.* From October 5-14, 2011, Deneffe logged 26.9 hours (*id.* at pp. 2-3); from October 15 through a departure on October 27, Deneffe logged 25.9 hours (*id.* at 4-5); and from an arrival on October 27 through flights made October 28, 2011, Deneffe logged 8.6 hours (*id.* at 6-7). There is no indication from the evidence submitted that any of these flights were designated as other than for IOE training. The training hours indicated in the log book total 61.8. Considering it is undisputed that the typical number of training hours for a probationary pilot is 35-40, the Court finds that no rational fact finder could conclude that a basis for Deneffe's termination – his "extended training period" – was false.

Second, Deneffe asserts that SkyWest has identified reasons other than poor performance for his termination and, thus, there is a question of fact as to whether the reason stated in the PRIA reference was accurate. SkyWest counters that its reasons for termination were neither "shifting" nor inconsistent, and the internal termination code on which Deneffe relies was incorrect (as it was for other employees) and has been "revamped."

The Court finds that a reasonable factfinder would not find SkyWest's termination reason "false" based on this argument. It is undisputed that the "Fail RTW Requirements" reason was listed on internal documents only and was not presented to any third party as a reason for Deneffe's termination. *See Brimm v. Building Erection Servs. Co., Inc.*, 311 F. Supp. 2d 1231, 1240 (D. Kan. 2004) (employer who gave different reasons to the employee, to the EEOC, and during a deposition raised an inference of pretext) (citing *Randle v. City of Aurora*, 69 F.3d 441, 455 (10th Cir. 1995)). In any case, Sachse testified that the termination codes were "rechanged" recently and "those people who were terminated prior to that, their old codes didn't get changed; so it's picking up whatever that new code is reflecting, not what the old code reflected. It's just an error in the software."

Sachse depo, 107: 4-15.  Deneffe does not rebut this testimony nor submit evidence raising a question as to its accuracy.  *See Randle*, 69 F.3d at 455 ("just because the reasoning relied upon for a certain action is mistaken does not mean that reason is pretextual").

As to the other reason given for termination – Deneffe's disruptive behavior on a Horizon Air flight – there is no evidence that this reason demonstrates a "change in position" as contemplated by the Tenth Circuit.  *See Jaramillo v. Colorado Judicial Dep't*, 427 F.3d 1303, 1311 (10th Cir. 2005) ("The timing of the change has been found to support the inference of pretext when it occurs after significant legal proceedings have occurred.").  Graser testified that he considered Deneffe's behavior on the Horizon Air flight together with his performance to determine whether Deneffe should be terminated.  Graser depo, 88: 8-20 ("Charles was pretty easy to get along with, he was pretty friendly, but I did have that issue with him on Horizon Airlines that was a pretty big one. We discussed that as well.").  However, the reason has not been proffered as an alternative reason for Deneffe's termination.  *See Jaramillo*, 427 F.3d at 1311 ("the mere fact that the [defendant] has offered different explanations for its decision does not create a genuine question of pretext").

Third, Deneffe argues that his "performance continued to improve after his six-month review."  SkyWest counters that Deneffe "ignores" the evidence demonstrating his performance regression.

The records on which Deneffe relies reflect evaluations from six captains who submitted evaluations after the January 30, 2012 mid-year review, from January 30 - February 20, 2012.  *See* Docket #96-15.  Deneffe is correct that these evaluations show more positive ratings for his flight performance than the other three submitted for his mid-year.  *Id.*  However, SkyWest produced evidence that it received a subsequent unsolicited "criticism" by a captain about Deneffe's flight performance in March 2012, and it received another in April 2012 (dockets ##92-15, 92-18); these

criticisms led Graser to seek an evaluation of Deneffe by a check airman, who noted "a lack of general airmanship that concern[ed]" him.  Docket 96-9.  Other than stating his own disagreement with these captains' opinions, Deneffe provides no evidence rebutting the opinions, such as evaluations from other captains during the same time period, which would support his contention that his performance "continued to improve."

Finally,[11] Deneffe contends that he "consistently met SkyWest's performance standards" as evidenced by the fact that he received no further training after he passed the line check and was "promoted" from "reserve status" to a "regular line schedule" just before his termination.  SkyWest responds that Deneffe's "subjective opinion concerning his job performance does not establish pretext."

With this evidence, the Court concludes that Deneffe has demonstrated material factual issues as to whether the reason given on the PRIA reference was false.  First, it is unrebutted that Deneffe received no further training nor any warnings or reports from Graser or Wall that they considered his flying "unsafe" after the mid-year evaluation.  Second, SkyWest fails to rebut the evidence demonstrating that Deneffe was "promoted" from "reserve status" to the regular line schedule on or about June 1, 2012.  On that day, Deneffe made a note in his log book that it was his "first flight as a line holder with [a] trip I chose with my favorite Captain Chris Anthenian."  Docket

---

[11]In support of his pretext argument, Deneffe also asserts SkyWest failed to follow its discipline policy with respect to his termination; however, as set forth above, it is only relevant here whether SkyWest's reason for submitting the PRIA reference is pretext and whether the reason set forth in the reference is false.  Nevertheless, a failure to follow discretionary company policies generally is insufficient to establish an inference of pretext.  *Matthews v. Euronet Worldwide*, 505 F. Supp. 2d 850, 861-62 (D. Kan. 2007) (citing *Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1182 (10th Cir. 2006) (no inference of retaliatory motive arises from defendant's failure to utilize progressive discipline prior to terminating plaintiff; employee handbook made progressive discipline discretionary)).  In this case, the discipline policy is defined as an "outline," as a "guideline," and gives the chief pilot the "discretion to consider the circumstances surrounding each event on its own merit" in assigning "an appropriate level of discipline to a category of behavior."  Docket #96-21.

#96-13 at 28-29.  It is undisputed that other captains noted Deneffe was previously on reserve status and did not fly often.  *See, e.g.,* Harper March 26, 2012 Email, docket #92-15; Graser depo, 48: 13-23.  But, on a regular line schedule, a pilot is guaranteed 75 hours flight time per month.  Graser depo, 171: 21-25, 72: 1.

This unrebutted evidence, that Deneffe was neither informed nor warned that his performance was a safety concern, and that SkyWest placed him on a regular line schedule on June 1, 2012 where he was guaranteed 75 hours of flight time per month, demonstrate a material factual issue as to whether the reason given in the PRIA for "poor performance" was false.  Furthermore, Deneffe's proffered evidence of age-related comments and the ages of terminated probationary pilots is sufficient to raise an inference that SkyWest was motivated by Deneffe's age in submitting the PRIA reference.

Accordingly, the Court will deny SkyWest's motion for summary judgment in its favor on Deneffe's claim alleging a violation of the ADEA.

### CONCLUSION

THEREFORE, Defendant's Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56 and D.C. Colo. LCivR 56.1 [filed February 4, 2016; docket #92] is **granted in part** as to Plaintiff's Title VII claim for relief and **denied in part** as to Plaintiff's ADEA claim for relief.  Count I of the Amended Complaint (docket #48) is dismissed with prejudice.

Dated at Denver, Colorado, this 26th day of April, 2016.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge